UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re MORTGAGE FUND '08 LLC, | Case No.  14-cv-00993-SI |
| Debtor. | **ORDER DISMISSING BANKRUPTCY APPEAL IN PART AND AFFIRMING BANKCRUPY COURT'S ORDER** |
| ———————————————/ | |
| SUSAN L. UECKER, in her capacity as Trustee of the Mortgage Fund '08 Liquidating Trust, | |
| Appellant, | |
| v. | |
| WELLS FARGO CAPITAL FINANCE, LLC, | |
| Appellee. | |
| ———————————————/ | |

Now before the Court is an appeal by appellant Susan L. Uecker from two orders and one memorandum decision entered by the Hon. Roger L. Efremsky of the Bankruptcy Court for the Northern District of California.  Dkt. No. 1.  The orders and memorandum decision appealed are: (1) the March 27, 2013 order granting appellee Wells Fargo Capital Finance, LLC's motion to dismiss the First Amended Complaint; (2) the February 11, 2014 memorandum decision granting Wells Fargo Capital Finance, LLC's motion to dismiss the Third Amended Complaint without leave to amend; and (3) the February 20, 2014 order dismissing with prejudice the Third Amended Complaint.  *Id.*  Upon careful consideration of the parties' papers, the Court DISMISSES Ms. Uecker's appeal from the March 27, 2013 order for lack of subject matter jurisdiction.  The Court AFFIRMS the February 11, 2014 memorandum decision and February 20, 2014 order and enters final judgment in favor of Wells Fargo Capital Finance, LLC.

# BACKGROUND

This case arises out of Wells Fargo Capital Finance, LLC's involvement in a series of financial transactions that allegedly depleted the assets of another corporation and led to its bankruptcy. The following facts are derived from Uecker's Third Amended Complaint ("TAC"). *See* Dkt. No. 17-1, Ex. 3. The Court accepts as true all factual, non-conclusory allegations made in the TAC. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–57 (2007); *Clegg v. Cult Awareness Network*, 18 F.3d 752, 754–55 (9th Cir. 1994).

## I.      Factual Background

Walter and Kelly Ng owned and controlled two investment companies that issued secured loans to real estate developers: R.E. Loans, LLC ("R.E. Loans") and the Mortgage Fund '08, LLC ("MF08"). TAC ¶¶ 2-5, 15-19. The Ngs also owned and managed the Mortgage Fund, LLC ("Manager"), which was MF08's sole owner, manager, and member. *Id.* ¶¶ 12, 15, 19, 39.

The Ngs and Bruce Horwitz established R.E. Loans in January 2002. *Id.* ¶ 5. B-4 Partners, LLC, which was owned by Walter Ng, Kelly Ng, Barney Ng, and Bruce Horwitz, managed R.E. Loans. *Id.* ¶ 16. R.E. Loans raised money by selling unregistered equity interests to investors. *Id.* ¶¶ 5-6, 16, 26-27, 39. In 2007, R.E. Loans began to face severe cash liquidity problems. *Id.* ¶¶ 6, 26-27. In July 2007, R.E. Loans obtained a $65 million line of credit from Wells Fargo Capital Finance, LLC ("Wells Fargo"), and gave Wells Fargo a priority security interest in its assets in return. *Id.* ¶¶ 7, 14, 31. R.E. Loans and Wells Fargo then executed a "Loan and Security Agreement" ("LSA") to govern the terms of their credit arrangement. *Id.* ¶¶ 8, 32-34; Dkt. No. 17-1, Ex. 6. LSA § 2.6 created a "lockbox" account that gave Wells Fargo control over R.E. Loans' revenues and expenditures. TAC ¶ 32; Dkt. No. 17-1, Ex. 6 at 24. In addition, LSA § 7.13 required that R.E. Loans' financial transactions meet certain conditions, including the prior approval of Wells Fargo, and that those transactions have "fair and reasonable terms." TAC ¶¶ 32,34; Dkt. No. 17-1, Ex. 6 at 51. However, LSA § 7.13 exempted transfers designated as "Permitted Dispositions," which LSA § 1.1 defined as "a sale of a Note Receivable . . . for a cash purchase price of not less than eighty (80%) of the unpaid balance. . . ." Dkt. No. 17-1, Ex. 6 at

15, 51.  Finally, LSA § 4.9(b) provided that "[w]hen a Note Receivable is sold by [R.E. Loans] in accordance with the terms of this Agreement, [Wells Fargo] shall release [Wells Fargo's] Liens in such Note Receivable. . . ." *Id.*

In October 2007, the managers of R.E. Loans created MF08 for the stated purpose of investing in secured real estate loans.  TAC ¶¶ 3, 8, 12, 18, 39, 46.  However, MF08's "true purpose" was to "funnel investors' money" from MF08 to R.E. Loans in order to pay R.E. Loans' investors and Wells Fargo's substantial transaction fees.  *Id.*  MF08 raised money by issuing promissory notes to investors in exchange for their investments.  *Id.* ¶¶ 3, 39, 47-48.  Between December 2007 and March 2009, MF08 raised over $80 million from investors, of which it transferred over $66 million to R.E. Loans, sometimes routing the money through B-4's accounts. *Id.* ¶¶ 3, 9, 40, 47, 74.  These transfers constituted "substantially all of the assets of MF08 and were to MF08's severe financial detriment. . . ." *Id.* ¶ 35.

When the transfers between R.E. Loans and MF08 began, MF08 maintained two bank accounts at Mt. Diablo Bank, a subsidiary of Greater Bay Bank.  *Id.* ¶ 43.  Greater Bay Bank merged with Wells Fargo's parent company in October 2007.  *Id.* ¶¶ 43, 51.  Wells Fargo allegedly became aware of the contents of MF08's bank accounts by virtue of this merger.  *Id.*

By February 2008, Wells Fargo learned about the transfers between R.E. Loans to MF08 upon reviewing R.E. Loans' financial statements.  *Id.* ¶¶ 35, 49, 51.  Specifically, Wells Fargo learned that MF08 had transferred unsecured cash loans to R.E. Loans in exchange for underperforming or defaulted loans.  *Id.* ¶¶ 41, 48, 52.  These unsecured debt transfers created a default by R.E. Loans under the LSA.  *Id.* ¶¶ 44, 49-50, 52.  To cure the default, Wells Fargo approved a "scheme" with the Manager to "cover up" the unsecured debt transfers:  R.E. Loans "would transfer loans it held on real estate to MF08, classify those assets as a sale to MF08, and backdate those transactions to make it appear as if the sale occurred at the time the cash was transferred by MF08." *Id.* ¶¶ 49-53, 56.  R.E. Loans sold these real estate loans to MF08 at face value, even though the loans were mostly non-performing or in default.  *Id.* ¶¶ 12, 52, 62, 65, 75.  R.E. Loans later transferred additional real estate loans to MF08 in exchange for cash.  *Id.* ¶¶ 82-24.  Wells Fargo participated in this "scheme" by releasing its liens on the loans R.E. Loans

3

United States District Court
Northern District of California

transferred to MF08.  *Id.* ¶¶ 52, 70.

To execute this plan, Wells Fargo allegedly reviewed MF08's governing documents, including a "Secured Promissory Note Purchase Agreement" ("NPA") between MF08 and its investors and the "Mortgage Fund '08 Note Program Confidential Offering Memorandum" ("Offering Memorandum").  *Id.* ¶¶ 12, 15, 41, 51.  NPA § 5.7 placed certain restrictions on MF08's ability to make loans to, and purchase existing loans from, "affiliates."[1]  TAC ¶ 41; Dkt. No. 17-1, Ex. 4 at 13-15.  In particular, NPA § 5.7(e) prohibited MF08 from making a loan to an affiliate (designated as a "related party loan") unless the loan met certain conditions: NPA § 5.7(e)(i) required that related party loans satisfy the same underwriting standards customarily applied by MF08 in other transactions and NPA § 5.7(e)(ii) prohibited related party loans made in excess of twenty percent of MF08's total loan portfolio.  TAC ¶ 41; Dkt. No. 17-1, Ex. 4 at 14-15.  Pursuant to the final paragraph of NPA§ 5.7(e), a related party loan did not include "any loan in which the borrower or co-borrower is a Sponsored Investment Fund. . . ."  Dkt. No. 17-1, Ex. 4 at 15.  In addition, NPA § 5.7(c) prohibited MF08 from purchasing existing loans from a "Sponsored Investment Fund" unless the borrower of the underlying loan was not in default and the loan satisfied underwriting criteria customarily applied to other MF08 transactions.[2]  TAC ¶¶ 41, 44.

By engaging in these transfers, the Manager allegedly depleted substantially all of MF08's assets in breach of its fiduciary duty to MF08.  *Id.* ¶¶ 11, 77.  Wells Fargo allegedly "knew about, facilitated and approved" these transfers and therefore knew that the Manager was breaching its fiduciary duty.  *Id.* ¶ 11.  According to the TAC, Wells Fargo knowingly assisted the Manager by releasing the liens it held on the loans R.E. Loans transferred to MF08.  *Id.* ¶¶ 46, 49, 51-52, 54, 68.  Wells Fargo allegedly benefitted from these transfers because the transfers removed non-

---

[1] NPA § 5.1(a) defined an "affiliate" as "any entity under control of, controlled by or under common control with [MF08] . . . provided, however, that 'Affiliate' shall not include any Noteholder or a limited partner or non-voting member of a Sponsored Investment Fund."  Dkt. No. 17-1, Ex. 4 at 9.  NPA § 5.1(c) expressly defined "Sponsored Investment Fund" to include R.E. Loans.  *Id.*

[2] The Offering Memorandum provided that "[i]n order to mitigate conflicts of interest that arise in connection with the loan purchase from, sale to, or co-investment with Sponsored Investment Funds . . . , such transactions will be made in compliance with lending criteria for such loans established by the Note Purchase Agreement."  Dkt. No. 17-1, Ex. 5 at 11; TAC ¶ 45.

performing loans from R.E. Loans and replaced them with cash, thus ensuring that Wells Fargo would collect approximately $4 million in transaction fees and enhancing Wells Fargo's priority security interest in R.E. Loans' assets.  *Id.* ¶¶ 41, 46, 48-49, 51-52, 56, 74, 76.

## II.     Procedural Background

On September 12, 2011, several investors of MF08 filed a Chapter 7 involuntary bankruptcy petition against MF08 in the Bankruptcy Court for the Northern District of California.[3] *Id.* ¶ 10; *see* Case No. 11-49803-RLE-11, Dkt. No. 1.  On February 3, 2012, the bankruptcy court appointed Susan L. Uecker as the Liquidating Trustee of the Mortgage Fund '08 Liquidating Trust ("Liquidating Trust") pursuant to a Liquidating Trust Agreement.  TAC ¶¶ 10, 13; Dkt. Nos. 16-2, 16-3.[4]

On June 26, 2012, Uecker initiated an action against Wells Fargo in bankruptcy court on behalf of the Liquidating Trust for the benefit of MF08's creditors.  TAC ¶ 10; *see* Case No. 12-04137, Dkt. No. 1.  Uecker alleged claims for fraudulent transfer under federal and California law and aiding and abetting breach of fiduciary duty under California law.  *Id.*

On March 27, 2013, pursuant to Federal Rule of Civil Procedure 54(b) and Federal Rule of Bankruptcy Procedure 7054, the bankruptcy court entered partial final judgment in favor of Wells Fargo and dismissed with prejudice Uecker's fraudulent transfer claims asserted in the First Amended Complaint.  Dkt. No. 17-1, Ex. 1; *see* Case No. 12-04137, Dkt. No. 52.  On February 11, 2014, the bankruptcy court issued a memorandum decision granting Wells Fargo's motion to dismiss the TAC and its sole remaining claim for aiding and abetting breach of fiduciary duty without leave to amend.  Dkt. No. 17-1, Ex. 2.  In its February 11, 2014 memorandum decision,

---

[3] The bankruptcy court subsequently entered an order converting the case to one under Chapter 11 of the Bankruptcy Code.  *See* Case No. 11-49803-RLE-11, Dkt. No. 11.

[4] Uecker asks the Court to take judicial notice of the "Joint Combined Chapter 11 Plan and Disclosure Statement" and "Order Approving Disclosure Statement and Confirming Joint Chapter 11 Plan."  Dkt. No. 16-1.  In considering a motion to dismiss, a court may take judicial notice of matters of public record outside the pleadings.  *See MGIC Indemn. Corp. v. Weisman*, 803 F.2d 500, 504 (9th Cir. 1986).  A court may also take judicial notice of facts that are not subject to reasonable dispute.  Fed. R. Evid. 201(b).  The Court therefore GRANTS Uecker's request for judicial notice.

United States District Court
Northern District of California

the bankruptcy court explained that "[t]o the extent any party takes the position that this Court may not enter a final order in this matter, the Court deems this Memorandum Decision a report and recommendation to the district court.  28 U.S.C. § 157(c)."  Dkt. No. 17-1, Ex. 2 at 2.  On February 20, 2014, the bankruptcy court entered an order dismissing with prejudice the TAC.  Case No. 12-04137, Dkt. No. 88.  *See Exec. Benefits Ins. Agency v. Arkison,* 134 S. Ct. 2165, 2172, 2174 (2014).  Accordingly, the Court will treat the bankruptcy court's memorandum decision as proposed findings of fact and conclusions of law.  *See id.* at 2174.  Uecker now appeals from the bankruptcy court's two orders and memorandum decision.

## DISCUSSION

### I.   Jurisdiction and Standard of Review

28 U.S.C. § 158(a) governs jurisdiction over an appeal from an order of a bankruptcy court.  *In re Frontier Properties, Inc.,* 979 F.2d 1358, 1362 (9th Cir. 1992).  The Court examines *de novo* a bankruptcy court's final orders and judgments rendered pursuant to 28 U.S.C. § 157(c)(2).  *See* 28 U.S.C. § 158(a)(1).  A district court reviewing a bankruptcy court's proposed findings of fact and conclusions of law rendered pursuant to 28 U.S.C. § 157(c)(1) shall enter a final order or judgment following *de novo* review.  28 U.S.C. § 157(c)(1); Fed. R. Bankr. P. 9033(d); *In re S. Cal. Sunbelt Developers, Inc.,* 608 F.3d 456, 461 (9th Cir. 2010).

In reviewing a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the Court must dismiss a complaint if it fails to state a claim upon which relief can be granted.  Fed. R. Civ. P. 12(b)(6).  A plaintiff must allege "enough facts to state a claim to relief that is plausible on its face."  *Twombly*, 550 U.S. at 570.  This "facial plausibility" standard requires the plaintiff to allege facts that add up to "more than a sheer possibility that a defendant has acted unlawfully."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  While the Court must accept the facts plead in the complaint as true and construe all facts in the light most favorable to the plaintiff, the Court is not required to accept as true "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences."  *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008).

United States District Court
Northern District of California

6

United States District Court
Northern District of California

## II.      Fraudulent Transfer

Wells Fargo asks the Court to dismiss Uecker's appeal as to the fraudulent transfer claims asserted in the First Amended Complaint for lack of subject matter jurisdiction, and in the alternative, to enter judgment against Uecker for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6).   Uecker contends that she properly preserved her fraudulent transfer claims for appeal and alleged sufficient facts in the First Amended Complaint to state a claim for fraudulent transfer.

### A.      Subject Matter Jurisdiction

Wells Fargo contends that the Court lacks subject matter jurisdiction over Uecker's appeal as to the fraudulent transfer claims asserted in the First Amended Complaint because Uecker failed to file a timely notice of appeal.   Uecker responds that she properly preserved her claims for appeal pursuant to *Lacey v. Maricopa County*, 693 F.3d 896 (9th Cir. 2012) (en banc).[5]

In order to appeal a judgment of a bankruptcy court to a district court, an appellant must file a notice of appeal within fourteen days of "the date of entry of the judgment . . . appealed from."  Fed. R. Bankr. P. 8002; *see* 28 U.S.C. § 158(a)(1).  On March 27, 2013, the bankruptcy court entered -- with Uecker's consent as to the form -- partial final judgment dismissing with prejudice the fraudulent transfer claims.  Dkt. No. 17-1, Ex. 1; *see* Case No. 12-04137, Dkt. No. 52.  Uecker filed her notice of appeal eleven months later, on February 25, 2014.  Dkt. No. 1.  Her appeal is therefore untimely and the Court lacks subject matter jurisdiction over her appeal as to the fraudulent transfer claims asserted in the First Amended Complaint.  *See Bowles v. Russell*, 551 U.S. 205, 209 (2007) ("the taking of an appeal within the prescribed time is 'mandatory and

---

[5] Citing *Executive Benefits Insurance Agency v. Arkison*, 134 S. Ct. 2165, 2173 (2014), Uecker also asserts that the bankruptcy court lacked the constitutional authority to enter a final judgment on the fraudulent conveyance claim.  However, Uecker does not dispute that parties may consent to the jurisdiction of the bankruptcy court, and that such consent permits the bankruptcy court to enter a final judgment.  *See In re Bellingham Ins. Agency, Inc.*, 702 F.3d 553, 558-60 (9th Cir. 2012).   Here, Uecker did not object to the bankruptcy court adjudicating the fraudulent conveyance claim, and Uecker consented to the form of the Rule 54(b) judgment.  In any event, the Court finds that even if the appeal was timely, the bankruptcy court properly dismissed the fraudulent conveyance claim.

jurisdictional.'") (citations omitted).

Uecker contends that she properly preserved her claims for appeal under *Lacey*. In *Lacey*, the Ninth Circuit held that a plaintiff is not required to replead claims dismissed with prejudice and without leave to amend in order to preserve the claims for appeal. *See* 693 F.3d at 928. Uecker argues that under *Lacey* she was not required to replead the dismissed fraudulent transfer claims in order to preserve them for appeal. Uecker's reliance on *Lacey* is misplaced. *Lacey* did not address the requirement that an appellant file a timely notice of appeal of a judgment to confer jurisdiction a district court with subject matter jurisdiction over a bankruptcy appeal. While *Lacey* holds that Uecker did not waive her right to appeal by opting not to replead her fraudulent transfer claims, Uecker was still required pursuant to Federal Rule of Bankruptcy Procedure 8002 to file her appeal within fourteen days of the bankruptcy court's March 27, 2013 judgment. Her failure to do so renders her appeal untimely. The Court therefore DISMISSES Uecker's appeal as to the fraudulent transfer claims for lack of subject matter jurisdiction.

### B.    Failure To State A Claim

In the alternative, Wells Fargo asks the Court to affirm the bankruptcy court's dismissal of the fraudulent transfer claims asserted in the First Amended Complaint for failure to state a claim. The bankruptcy court held that the First Amended Complaint failed to allege that Wells Fargo was an intended beneficiary of the fraudulent transfers from MF08 to R.E. Loans under 11 U.S.C. § 550(a)(1) and California Civil Code § 3439.08(b)(1). Dkt. No. 17-1, Ex. 1. On appeal, Uecker contends that the First Amended Complaint alleged sufficient facts to state a claim for fraudulent transfer under an intended beneficiary theory.[6]

Relying upon a bankruptcy trustee's authority under 11 U.S.C. § 544(b) to "avoid any

---

[6] Uecker's opening brief references an alternative "subsequent transferee" theory of recovery. However, Uecker represented to the bankruptcy court that she "w[ould] not seek recovery from Wells Fargo as a subsequent transferee, but [would] instead focus only on Wells Fargo's status as the entity for whose benefit the transfers were made."). *See* Opp'n to Second Mot. to Dismiss at 12 n.2 (Dkt. 10). Thus, Uecker affirmatively waived the issue below and cannot raise it on appeal. *See Norwood v. Vance*, 591 F.3d 1062, 1076 (9th Cir. 2009) (holding that argument forfeited below could not be considered "for the first time on appeal").

United States District Court
Northern District of California

United States District Court
Northern District of California

transfer of an interest of the debtor in property . . . that is voidable under applicable law by a creditor holding an unsecured claim," Uecker alleged claims against Wells Fargo for actual fraudulent transfer and for constructive fraudulent transfer under the California Uniform Fraudulent Transfers Act ("CUFTA"). Cal. Civ. Code § 3439.04.   11 U.S.C. § 550(a)(1) authorizes a trustee to recover fraudulent transfers from "the entity for whose benefit the transfer was made." 11 U.S.C. § 550(a)(1); *see also* Cal. Civ. Code § 3439.08.   Under that theory, a plaintiff must allege that "in transferring the avoided funds, the debtor must have been motivated by an intent to benefit the individual or entity from whom the trustee seeks to recover." *Danning v. Miller* (*In re Bullion Reserve of N. Am*), 922 F.2d 544, 547 (9th Cir. 1991).  "The paradigm 'entity for whose benefit such transfer was made' is a guarantor or debtor-someone who receives the benefit but not the money." *Bonded Fin. Servs. Inc. v. European American Bank*, 838 F.2d 890, 895 (7th Cir. 1988) (cited with approval in *In re Mastro*, Bankruptcy Nos. WW-10-1099-JuMkH, 09–1684, 2011 WL 3300370, at *10 (9th Cir. B.A.P. Mar. 11, 2011)).   However, a plaintiff need not allege a direct transfer to the intended beneficiary or that the intended beneficiary received an actual benefit. *Id.*

The First Amended Complaint alleged,

> Wells Fargo benefited from the fraudulent transfers from MF 08 to RE Loans. RE Loans was the initial transferee of the fraudulent transfers because he used the money to pay Wells Fargo's fees and interest on the line of credit, distributions to its members and other expenses. Wells Fargo was the entity for whose benefit the transfers were made because the transfers ensured the continued payment of Wells Fargo's fees and interest and enhanced Wells Fargo's security interest in RE Loans. Instead of Wells Fargo holding a first security interest in the [transferred loans], it was able to replace those impaired loans with cash representing the face value of those loans. As alleged above, Wells Fargo demanded that as a condition of issuing a line of credit to RE Loans, it received a first priority security interest in RE Loans' assets that was senior to the members' interests. By receiving money from MF 08, RE Loans was able to pay distributions to its investors (approximately $120 million in the period after the exchange offer), decreasing the strength of their claims against RE Loans' collateral and increasing the likelihood that Wells Fargo would continue to collect its fees and interest on the line of credit and repayment on its line of credit.

First Am. Compl. ¶ 59 (Dkt. 10).

Uecker contends that she sufficiently alleged that in making the transfers from MF08 to

1    R.E. Loans, MF08 was motivated by an intent to benefit Wells Fargo because MF08 and R.E.

2    Loans had overlapping managers; Wells Fargo held a first security interest on R.E. Loans' assets;

3    the cash transfers replaced non-performing, underwater loans with cash; and the transfers

4    prevented R.E. Loans from defaulting on its obligations, including the substantial fees and interest

5    it was paying Wells Fargo.  Uecker argues that the FAC alleged motivation to benefit Wells Fargo

6    because Wells Fargo's security interest was objectively enhanced because the value of its

7    collateral materially increased (from non- or under-performing real estate loans to cash

8    representing the loans' face value), and the cash transfers from MF08 to R.E. Loans kept R.E.

9    Loans operational, allowing it to continue paying fees and charges to Wells Fargo.

10           The Court agrees with the bankruptcy court that the First Amended Complaint failed to

11   allege that Wells Fargo was an intended beneficiary.  The FAC alleged that Wells Fargo took a

12   first priority security interest in all of R.E. Loans' assets, and that Wells Fargo was an intended

13   beneficiary because the transfers "replac[ed] non- or under-performing notes with cash

14   representing the notes' face value."  First Am. Compl. ¶ 59.  The transfers allegedly increased the

15   value of R.E. Loans' assets and, incidentally, the value of Wells Fargo's collateral.  However,

16   merely alleging that someone benefitted from a transaction is not enough to sustain an intended-

17   beneficiary fraudulent transfer claim because "the transfer must have been made for [the

18   transferee's] benefit." *In re Bullion Reserve*, 922 F.2d at 548.  Similarly, the fact that Wells Fargo

19   stood to gain from subsequent transfers made by R.E. Loans to Wells Fargo in the form of fees

20   and interest charges does not support the inference that the *initial* transfers from MF08 to R.E.

21   Loans were made *for* Wells Fargo's benefit.  *See id.*; *see also In re Mastro*, 2011 WL 3300370, at

22   *10 ("The benefit must derive directly from the transfer, not from the use to which it is put by the

23   transferee.").  It is true that Uecker did not have to allege a direct transfer from MF08 to Wells

24   Fargo or that Wells Fargo received an actual benefit.  Nevertheless, she failed to make the

25   requisite showing that the initial transfers from MF08 to R.E. Loans, rather than subsequent

26   transfers from R.E. Loans to Wells Fargo, were intended to benefit Wells Fargo.  *See id.* at 548.

27           Accordingly, the Court finds that even if the Court has jurisdiction over Uecker's appeal as

28   to the fraudulent transfer claim, the First Amended Complaint failed to state a claim for fraudulent

transfer.   The Court therefore AFFIRMS the bankruptcy court's March 27, 2013 order and judgment.

### III.      Aiding and Abetting Breach of Fiduciary Duty

In its February 11, 2014 memorandum decision, the bankruptcy court dismissed the TAC and its sole remaining claim for aiding and abetting breach of fiduciary duty under California law without leave to amend.[7]   The bankruptcy court dismissed the aiding and abetting claim on two grounds: (1) failure to state a claim under Federal Rule of Civil Procedure 12(b)(6); and (2) the affirmative defense of *in pari delicto*.  *See* Dkt. No. 17-1, Ex. 2.  On appeal, Uecker contends that she alleged sufficient facts to state an aiding and abetting claim against Wells Fargo and that *in pari delicto* does not preclude her claim.

#### A.      Failure to a State A Claim

To state a claim for aiding and abetting breach of fiduciary duty under California law, a plaintiff must allege that the defendant: (1) had actual knowledge of the specific primary wrong being committed by the fiduciary; and (2) provided substantial assistance to the fiduciary to accomplish the specific breach of fiduciary duty.   *See Casey v. U.S. Bank Nat'l Ass'n*, 127 Cal. App. 4th 1138, 1145-46 (Cal. Ct. App. 2005); *Henry v. Lehman Commercial Paper, Inc.* (*In re First Alliance Mortg. Co.*), 471 F.3d 977, 993-95 (9th Cir. 2006); *Neilson v. Union Bank of California, N.A.*, 290 F. Supp. 2d 1101, 1119 (C.D. Cal. 2003).

The bankruptcy court held that Uecker failed to allege that Wells Fargo actually knew the Manager was stripping MF08's assets in breach of the Manager's fiduciary duty.  Dkt. No. 17-1, Ex. 2 at 17, 24-25.   The bankruptcy court further found that the TAC failed to allege that Wells Fargo provided substantial assistance to the Manager by releasing its liens on the loans.  *Id.* at 27.

#### (1)      Actual Knowledge

---

[7] In its February 20, 2014 order, the bankruptcy court granted Wells Fargo's motion to dismiss the TAC and dismissed the TAC with prejudice.  *See* Case No. 12-04137, Dkt. No. 88.

United States District Court
Northern District of California

Wells Fargo argues that the TAC failed to plausibly allege that Wells Fargo possessed actual knowledge of the Manager's alleged fiduciary breach.   To sufficiently plead actual knowledge, a plaintiff must allege that the defendant actually knew the fiduciary was committing the specific breach for which the plaintiff seeks to hold the defendant liable.   *See Casey*, 127 Cal. App. 4th at 1149 (citing *In re Sharp Int'l Corp. v. State Street and Trust Co.*, 281 B.R. 506 (Bankr. E.D.N.Y. 2002)).   The TAC alleges that the Manager breached its fiduciary duty to MF08 by transferring substantially all of MF08's assets to R.E. Loans to MF08's severe financial detriment. TAC ¶¶ 11-12, 77.   The bankruptcy court found that Uecker failed to allege that Wells Fargo actually knew about MF08's financial condition or knew that the Manager was depleting MF08's assets.   Dkt. No. 17-1, Ex. 2 at 15-25.   Uecker contends that she sufficiently alleged multiple avenues through which Wells Fargo acquired actual knowledge of the Manager's fiduciary breach.

### (a)      MF08's Financial Condition

Uecker alleges that Wells Fargo acquired actual knowledge of MF08's financial condition by reviewing the LSA and NPA, and by virtue of an October 2007 merger involving Wells Fargo and MF08's bank.   According to Uecker, Wells Fargo's knowledge of MF08's financial condition supports the inference that it knew the Manager's transfers were causing severe financial harm to MF08.

First, Uecker argues that Wells Fargo became aware of MF08's financial condition by evaluating the transfers between R.E. Loans and MF08 in accordance with the terms of the LSA. The LSA governed the credit arrangement between R.E. Loans and Wells Fargo.   TAC ¶¶ 8, 32-24.   LSA § 2.6 established a "lockbox" account that gave Wells Fargo control over R.E. Loans' revenues and expenditures.   *Id.*   LSA § 7.13 required that R.E. Loans' financial transactions meet certain conditions, including prior approval from Wells Fargo and "fair and reasonable terms."   *Id.* Uecker argues that these provisions prompted Wells Fargo to evaluate the terms of the transfers between R.E. Loan and MF08 and thus learn of MF08's financial condition.

The bankruptcy court properly held that these provisions of the LSA do not plausibly allege that Wells Fargo actually knew of MF08's financial condition.   Uecker fails to explain how

12

maintaining control over *R.E. Loans*' revenues and expenditures pursuant to LSA § 2.6's "lockbox" provision gave Wells Fargo actual knowledge of *MF08*'s financial condition. In addition, the bankruptcy court properly found that LSA § 7.13's restrictions did not apply to the transfers from MF08 to R.E. Loans. *See* Dkt. No. 17-1, Ex. 2 at 16-17. LSA § 7.13 exempted transfers designated as "Permitted Dispositions," which LSA § 1.1 defined as "a sale of a Note Receivable . . . for a cash purchase price of not less than eighty [percent] (80%) of the unpaid balance. . . ." Dkt. 17-1, Ex. 6 at 15, 51. R.E. Loans sold the secured notes to MF08 at face value in exchange for cash, so the sales constituted "Permitted Dispositions" and were thus exempt from LSA § 7.13. TAC ¶¶ 12, 52, 75. Given that the sales from R.E. Loans to MF08 were exempt from LSA § 7.13, the Court cannot infer that Wells Fargo evaluated the terms of the transfers and learned MF08's financial condition as a result.

Uecker's next theory is that Wells Fargo learned about MF08's financial condition by reviewing MF08's NPA between MF08 and its investors. In February 2008, Wells Fargo learned that MF08 made unsecured loans to R.E. Loans, which allegedly prompted Wells Fargo to review the NPA and discover its restrictions on related party lending. Specifically, NPA § 5.7(e)(ii) prohibited MF08 from making "related party loans" in excess of twenty percent of MF08's total loan portfolio. TAC ¶ 41. Uecker argues that calculating this twenty percent ratio required Wells Fargo to determine the value of MF08's total loan portfolio. *Id.*

The bankruptcy court properly held that the terms of the NPA do not support the inference that Wells Fargo actually knew MF08's financial condition. The loans from MF08 to R.E. Loans were not subject to the restrictions in NPA § 5.7(e). NPA § 5.7(e) prohibited MF08 from making a loan to an "affiliate"[8] (designated as a "related party loan") unless the loan met certain conditions: NPA § 5.7(e)(i) required that related party loans satisfy the same underwriting standards customarily applied by MF08 in other transactions and NPA § 5.7(e)(ii) prohibited

---

[8] NPA § 5.1(a) defined an "affiliate" as "any entity under control of, controlled by or under common control with [MF08] . . . provided, however, that 'Affiliate' shall not include any Noteholder or a limited partner or non-voting member of a Sponsored Investment Fund." Dkt. No. 17-1, Ex. 4 at 9. NPA § 5.1(c) expressly defined "Sponsored Investment Fund" to include R.E. Loans. *Id.*

related party loans made in excess of twenty percent of MF08's total loan portfolio.  TAC ¶ 41; Dkt. No. 17-1, Ex. 4 at 14-15.  However, pursuant to the final paragraph of NPA§ 5.7(e), a related party loan did *not* include "any loan in which the borrower or co-borrower is a Sponsored Investment Fund. . . ."  Dkt. No. 17-1, Ex. 4 at 15.  NPA § 5.1(c), in turn, expressly defined "Sponsored Investment Fund" to include R.E. Loans.[9]  *Id.* at 9.  Therefore, the loans made by MF08 to R.E. Loans were not subject to the restrictions in NPA § 5.7(e) because R.E. Loans was a "Sponsored Investment Fund."  Accordingly, NPA § 5.7(e)(ii)'s proscription of related party loans in excess of twenty percent of MF08's loan portfolio did not apply to the loans from MF08 to R.E. Loans.  The Court therefore cannot infer that Wells Fargo calculated this twenty percent ratio and determined the value of MF08's total loan portfolio.

Uecker responds that by interpreting these provisions of the LSA and NPA, the bankruptcy court reached factual conclusions and drew inferences in Wells Fargo's favor.  While resolving the disputed meaning of a contact is generally inappropriate on a motion to dismiss, dismissal may be appropriate where the language of the contract is clear.  *See Skilstaf, Inc. v. CVS Caremark Corp.*, 669 F.3d 1005, 1017 (9th Cir. 2012).  In addition, the Court is not required to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences. *In re Gilead Scis. Sec. Litig.*, 536 F.3d at 1055.  The provisions of the LSA and NPA on which Uecker's various theories of knowledge rely are not ambiguous or unclear, and do not support an inference that Wells Fargo actually knew about MF08's financial condition or the Manager's fiduciary breach.

Uecker's final theory is that Wells Fargo acquired actual knowledge of MF08's financial condition by virtue of the October 2007 merger between Greater Bay Bank and Wells Fargo's parent company.  MF08 maintained two bank accounts at Greater Bay Bank's subsidiary, Mt. Diablo Bank.  TAC ¶¶ 43, 51.  According to Uecker, when Greater Bay Bank merged with Wells Fargo's parent company in October 2007, Wells Fargo learned about the contents of MF08's two

---

[9] The Offering Memorandum provided that transactions with a Sponsored Investment Fund "will be made in compliance with lending criteria for such loans established by the Note Purchase Agreement."  Dkt. No. 17-1, Ex. 5 at 11.

United States District Court
Northern District of California

bank accounts at Mt. Diablo Bank.  *Id.* ¶ 43.

The October 2007 merger does not plausibly establish that Wells Fargo actually knew about MF08's financial condition.  The TAC does not allege that MF08 maintained *all* of its bank accounts at Mt. Diablo Bank, and Uecker fails to explain how knowing the contents of two bank accounts at Mt. Diablo Bank would give Wells Fargo actual knowledge of MF08's entire financial condition.  Furthermore, Uecker fails to allege that either parent company exercised any degree of control over its subsidiaries or otherwise maintained an agency relationship with its subsidiaries, such that knowledge held by the subsidiary could be imputed to the parent.  *See Defer LP v. Raymond James Fin., Inc.*, 654 F. Supp. 2d 204, 218 (S.D.N.Y. 2009) (refusing to aggregate knowledge of two or more separate corporate entities on the basis that they share the same parent).  Without more, the October 2007 merger does not support an inference that Wells Fargo knew about MF08's financial condition.

Accordingly, none of Uecker's theories plausibly allege that Wells Fargo actually knew about MF08's financial condition and therefore knew that the Manager's transfers were causing severe financial harm to MF08.

### (b)     Breach of Contract Allegations

Next, Uecker contends that Wells Fargo knew the Manager breached its fiduciary duty because Wells Fargo knew the Manager breached multiple provisions of the NPA.  For example, Uecker alleges that NPA § 5.7(c) permitted MF08 to purchase loans from R.E. Loans only if the borrower of the underlying loan was not in default and the loan satisfied underwriting criteria customarily applied to other MF08 loan transactions.  TAC ¶¶ 41, 44.  The bankruptcy court held that the NPA did not provide a basis for inferring actual knowledge because Wells Fargo was not a party to the NPA and because "[t]here is a difference between knowledge that MF08 may have been breaching the terms of the Note Purchase Agreement with its investors and knowledge that the Manager was breaching its fiduciary duty to MF08." Dkt. No. 17-1, Ex. 2 at 21-22.

The bankruptcy court properly rejected Uecker's breach of contract argument.  Wells Fargo was not a party to the NPA between MF08 and its investors.  Uecker does not explain how

1    Wells Fargo would have known about the underwriting criteria that MF08 customarily applied to

2    other transactions.  Even if Wells Fargo did know that the transferred loans failed to satisfy

3    MF08's underwriting criteria and were non-performing in violation of NPA § 5.7(c), these facts at

4    most suggest that Wells Fargo was aware of the Manager's breach of a contract.  However, Uecker

5    fails to explain how knowledge of a breach of contract provides a basis for inferring knowledge of

6    a breach of fiduciary duty.  Without more, the allegations regarding the NPA do not support the

7    inference that Wells Fargo knew the Manager was breaching its fiduciary duty to MF08.

8

9                    **(c)    Backdating Allegations**

10          Lastly, Uecker contends that Wells Fargo "backdated" the unsecured debt transfers in

11   order to conceal the Manager's fiduciary breach.  "Backdating" refers to an alleged "scheme"

12   between Wells Fargo and the Manager to cure a default under the LSA by converting the improper

13   unsecured debt transfers into asset sales, which Wells Fargo then backdated with the earlier date of

14   the original unsecured debt transfers.  TAC ¶¶ 44, 49-53, 56.  Uecker argues that "backdating" the

15   transfers in this manner is consistent with an effort to mislead, and thus supports the inference that

16   Wells Fargo actually knew that the Manager was depleting MF08's assets.  The bankruptcy court

17   held that the backdating allegations showed that Wells Fargo merely sought to cure a default under

18   the LSA rather than "cover up" the Manager's fiduciary breach.  Dkt. No. 17-1, Ex. 2 at 20-21.

19          The bankruptcy court properly held that the backdating allegations do not plausibly allege

20   that Wells Fargo actually knew about the Manager's fiduciary breach.  In California, a plaintiff

21   asserting an aiding and abetting claim must plausibly allege that the defendant had actual

22   knowledge of the *specific primary violation* by the wrongdoer. *Casey*, 127 Cal. App. 4th at 1148

23   (citing *Neilson*, 290 F. Supp. 2d at 1119) (emphasis added)).  "[T]he actual knowledge standard [ ]

24   require[s] more than a vague suspicion of wrongdoing." *In re First Alliance*, 471 F.3d at 993 n.4.

25   Rather than alleging actual knowledge of the specific primary violation (depletion of MF08's

26   assets), Uecker merely alleges that Wells Fargo's "backdating scheme" was consistent with an

27   effort to mislead.  She fails to explain how curing a default under the LSA by "backdating" the

28   loans establishes that Wells Fargo knew the loans were depleting MF08's assets.  Therefore, the

TAC fails to allege that Wells Fargo engaged in this "backdating scheme" to "cover up" the Manager's fiduciary breach.

For the reasons discussed above, none of Uecker's theories plausibly allege that Wells Fargo actually knew the Manager was breaching its fiduciary duty by depleting MF08's assets.

### (2)     Substantial Assistance

Wells Fargo argues that the bankruptcy court properly held that the TAC failed to plead substantial assistance. To plead substantial assistance, a plaintiff must allege that the defendant's conduct was a substantial factor in bringing about the injury allegedly suffered by the plaintiff. *See Neilson*, 290 F. Supp. 2d at 1118, 1129-32. California courts "have long held that liability for aiding and abetting depends on proof the defendant had actual knowledge of the specific primary wrong that the defendant substantially assisted." *Casey*, 127 Cal. App. 4th at 1145. Ordinary business transactions may satisfy the substantial assistance element if the defendant actually knew those ordinary transactions assisted the commission of the specific tort. *Id.*; *see also In re First Alliance,* 471 F.3d at 995.

The TAC alleges that Wells Fargo provided substantial assistance by releasing the liens it held on the loans made by R.E. Loans to MF08. Uecker asserts that she sufficiently plead substantial assistance because the transfer could not have occurred if Wells Fargo had not released its liens.

The bankruptcy court properly found that Uecker failed to plausibly allege substantial assistance. For an ordinary business transaction, such as releasing a lien on a loan, to constitute substantial assistance, Uecker must plausibly allege that Wells Fargo actually knew that releasing the liens would assist the Manager in depleting MF08's assets. *See Casey*, 127 Cal. App. 4th at 1145. As discussed above, Uecker failed to allege that Wells Fargo possessed actual knowledge of the alleged fiduciary breach. Indeed, Wells Fargo was required to release its liens on some of the loans pursuant to LSA § 4.9(b). Dkt. No. 17-1, Ex. 6 at 38 ("When a Note Receivable is sold by [R.E. Loans] in accordance with the terms of this Agreement, [Wells Fargo] shall release [Wells Fargo's] Liens in such Note Receivable. . . ."). Therefore, Wells Fargo's "ministerial"

actions in releasing the liens do not sufficiently allege substantial assistance.  *See* Dkt. No. 17-1, Ex. 2 at 26.

Accordingly, Uecker failed to state a claim for aiding and abetting breach of fiduciary duty under California law.  The Court therefore AFFIRMS the bankruptcy court's February 11, 2014 memorandum decision and February 20, 2014 order and DISMISSES Uecker's appeal as to the aiding and abetting claim.

### B.    *In Pari Delicto*

Alternatively, Wells Fargo contends that the affirmative defense of *in pari delicto* precludes Uecker's aiding and abetting breach of fiduciary duty claim.  Under California law, "[t]he doctrine of *in pari delicto* dictates that when a participant in illegal, fraudulent, or inequitable conduct seeks to recover from another participant in that conduct, the parties are deemed *in pari delicto*, and the law will aid neither, but rather, will leave them where it finds them."  *Casey*, 127 Cal. App. 4th at 1143 n.1; *Peregrine Funding, Inc. v. Sheppard Mullin Richter & Hampton, LLP*, 133 Cal. App. 4th 658, 677-79 (Cal. Ct. App. 2005); *see also Golden State TD Inv., LLC v. Andrews Kurth LLP (In re California TD Inv. LLC)*, 489 B.R. 124, 129 (Bankr. C.D. Cal. 2013).[10]  California courts have applied the *in pari delicto* defense to aiding and abetting breach of fiduciary duty claims brought by bankruptcy trustees where the underlying misconduct can be imputed to the corporate entity, and therefore to the trustee.   *See Peregrine Funding, Inc.*, 133 Cal. App. 4th at 679 (applying *in pari delicto* to bar bankruptcy trustee's claims against debtor's law firm for alleged misconduct arising out of Ponzi scheme); *Casey*, 127 Cal. App. 4th at 1143-44 (holding that *in pari delicto* doctrine could apply to bar claim by trustee of bankrupt corporation against banks for allegedly aiding and abetting corporate fiduciaries in looting the corporation, but that trial court erred by sustaining demurrer because there were factual issues regarding imputing fiduciaries' knowledge of wrongdoing).

---

[10]  State law controls which claims and defenses may apply in bankruptcy.  *See Raleigh v. Ill. Dep't of Revenue*, 530 U.S. 15, 20 (2000) (citing *Butner v. United States*, 440 U.S. 48, 54, 57 (1979)).

United States District Court
Northern District of California

The bankruptcy court held that the doctrine of *in pari delicto* applied to Uecker in her capacity as a liquidating trustee, and that under the "sole actor exception" knowledge of the Manager's wrongdoing was imputed to MF08 (and therefore Uecker) because the Manager and MF08 were one and the same. Dkt. No. 17-1, Ex. 2 at 10, 13.[11] On appeal, Uecker contends that *in pari delicto* does not apply to her as a liquidating trustee, and that even if the doctrine does apply, the bankruptcy court erred by deciding that question on the pleadings.

Although the Ninth Circuit has not directly addressed the issue, every circuit to have considered the question has held that a defendant "sued by a trustee in bankruptcy may assert the defense of *in pari delicto*, if the jurisdiction whose law creates the claim permits such a defense outside of bankruptcy." *Peterson v. McGladrey & Pullen, LLP*, 676 F.3d 594, 598-99 (7th Cir. 2012); *see also Picard v. JPMorgan Chase Bank & Co. (In re Bernard L. Madoff Inv. Sec. LLC)*, 721 F.3d 54, 63-65 (2d Cir. 2013), *cert. denied sub nom. Picard v. HSBC Bank PLC*, 134 S. Ct. 2895 (2014); *Baena v. KPMG LLP*, 453 F.3d 1, 6-10 (1st Cir. 2006); *Official Comm. v. R.F. Lafferty & Co.*, 267 F.3d 340, 354-60 (3d Cir. 2001); *In re Derivium Capital LLC*, 716 F.3d 355, 366-69 (4th Cir. 2013); *Terlecky v. Hurd (In re Dublin Sec., Inc.)*, 133 F.3d 377, 380 (6th Cir. 1997); *Grassmueck v. Am. Shorthorn Ass'n*, 402 F.3d 833, 836-42 (8th Cir. 2005); *Sender v. Buchanan (In re Hedged-Invs. Assocs.)*, 84 F.3d 1281, 1285 (10th Cir. 1996); *Official Comm. v. Edwards*, 437 F.3d 1145, 1152 (11th Cir. 2006).

The Ninth Circuit has not addressed, in a published opinion, the applicability of the *in pari delicto* doctrine to claims brought by a liquidating trustee. However, in an unpublished decision, the Ninth Circuit affirmed a decision by Judge Chesney of this Court in which she held that the *in pari delicto* defense could be asserted against a bankruptcy trustee because "[w]here, as here, a bankruptcy trustee files claims on behalf of the bankruptcy estate, § 541(a)(1) . . . provides that the trustee's rights are no greater than the rights of the debtor." *In re Crown Vantage, Inc.*, No. 02-3836 MMC, 2003 WL 25257821, at *6 (N.D. Cal. Sept. 25, 2003), *aff'd Crown Paper Liquidating*

---

[11] The Court notes that a California state court recently rejected many of the same arguments Uecker asserts in this appeal, and applied *in pari delicto* to bar Uecker's claims asserted against R.E. Loans' counsel arising out of the same transactions. *See Uecker v. Greenberg Traurig, LLP*, No. RG 13-694649 (Cal. Super. Ct. July 22, 2014). Dkt. 17-1 Ex. 8.

United States District Court
Northern District of California

*Trust v. Pricewaterhousecoopers LLP*, 198 Fed. Appx. 597 (9th Cir. Aug. 9, 2006) ("We affirm for the reasons set forth in the well-reasoned district court orders filed on September 25, 2003, July 12, 2004, March 28, 2005 and March 30, 2005, in this consolidated appeal."), *cert. denied*, *Crown Paper Liquidating Trust v. PricewaterhouseCoopers*, 549 U.S. 1253 (2007).

*In re Crown Vantage, Inc.*, involved claims brought by a liquidating trustee against numerous defendants arising out of the alleged fraudulent looting of a corporation. Judge Chesney held that the defendants could assert the *in pari delicto* defense against claims brought by the trustee:

> As explained in [*Sender v. Buchanan (In re Hedged–Investments Associates, Inc.*), 84 F.3d 1281, 1284–86 (10th Cir. 1996)], when a trustee asserts a claim on behalf of a debtor, the trustee proceeds under 11 U.S.C. § 541(a)(1), which defines the property of the estate as "all legal or equitable interests of the debtor in property as of the commencement of the case." *See Sender*, 84 F.3d at 1285 (citing 11 U.S.C. § 541(a)(1)). *Sender* concluded that § 541(a)(1) "establishes the estate's rights as no stronger than they were when actually held by the debtor," and thus *in pari delicto*, or any other defense available as against the debtor, can be asserted against the trustee. *See id.*

> The legislative history of § 541 lends support for this conclusion:

> "Though this paragraph [§ 541(a)(1)] will include choses in action and claims by the debtor against others, it is not intended to expand the debtor's rights against others more than they exist at the commencement of the case. For example, if the debtor has a claim that is barred at the time of the commencement of the case by the statute of limitations, then the trustee would not be able to purse that claim, because he too would be barred."

> H.R. Rep. 95–595, at 367–68, *reprinted in* 1978 U.S.C.C.A.N. 5963, 6323.

*In re Crown Vantage, Inc.*, 2003 WL 25257821, at *6.

Uecker relies on *F.D.I.C. v. O'Melveny & Myers*, 61 F.3d 17, 19 (9th Cir. 1995), to argue that a liquidating trustee is not subject to the *in pari delicto* defense. In *O'Melveny*, the Ninth Circuit held that "defenses based on a party's unclean hands or inequitable conduct do not generally apply against that party's receiver. . . . A receiver, like a bankruptcy trustee and unlike a normal successor in interest, does not voluntarily step into the shoes of the bank; it is thrust into those shoes." *Id.* at 19. However, courts have distinguished *O'Melveny* on the ground it involved

United States District Court
Northern District of California

United States District Court
Northern District of California

claims brought by a receiver rather than a bankruptcy trustee.  *See In re Crown Vantage, Inc.*, 2003 WL 25257821, at *6 ("*O'Melveny* is distinguishable, as that case involved a receiver, a party not subject to the restrictions of § 541(a)(1)."); *see also In re Derivium Capital LLC*, 716 F.3d at 365; *see also Lafferty*, 267 F.3d at 358 (distinguishing *O'Melveny* from action brought by bankruptcy trustee; noting "unlike bankruptcy trustees, receivers are not subject to the limits of section 541"); *Peregrine Funding, Inc.*, 133 Cal. App. 4th at 680 n.14 ("Cases cited by plaintiffs that have declined to apply the *in pari delicto* doctrine to claims asserted in a receivership (*see, e.g., O'Melveny*, *supra*, 969 F.2d at pp. 751–752) are distinguishable because, unlike a receiver, a bankruptcy trustee's standing is based on, and subject to the limits of, 11 U.S.C. § 541.").  The Court agrees with these cases and finds that *O'Melveny* is distinguishable because it arose in a receiver context, and that the language in *O'Melveny* regarding bankruptcy trustees is dicta.[12]  For the same reason, the Court finds inapposite the other cases involving receivers that Uecker relies upon.  *See Scholes v. Lehmann*, 56 F.3d 750, 754 (7th Cir. 1995) (holding that *in pari delicto* did not bar a receiver's claims for fraudulent conveyance)[13]; *Camerer v. California Savings & Commercial Bank of San Diego*, 4 Cal.2d 159, 170 (1935) ("Thus, it is held that although the insolvent debtor cannot set aside a transfer in fraud of his creditors, as he is *in pari delicto*, the receiver acting for the creditors may attack it.").

Uecker also argues that the rationale of the *in pari delicto* doctrine is not served here because she herself is not a wrongdoer.  However, courts have applied the *in pari delicto* doctrine to bar claims by liquidating bankruptcy trustees against third parties for participating in fraudulent schemes perpetrated by the debtor.  *See, e.g., In re Bernard L. Madoff Inv. Securities LLC.*, 721 F.3d at 64 (affirming dismissal on *in pari delicto* grounds of liquidating trustee's aiding and

---

[12]  The Court notes that on appeal, the liquidating trustee in *In re Crown Vantage, Inc.* presented the same arguments that Uecker advances against the application of *in pari delicto*, and specifically argued that *O'Melveny* precluded the application of the *pari delicto* doctrine to trustees, s*ee* Br. for Plaintiff-Appellant, (9th Cir. 2006) (No. 04-16597), 2004 WL 3140375, at *17-19.

[13]  The Seventh Circuit later held in *Peterson* that *Scholes* did not prevent *in pari delicto* from applying to a trustee and limited *Scholes* to the receivership context.  *See Peterson*, 676 F.3d at 599 ("That sentence is dictum; *Scholes* did not entail a *pari delicto* defense. It has nothing to do with § 541 of the Bankruptcy Code; *Scholes* was not a bankruptcy proceeding. And it does not stand for the proposition that federal law overrides state law defenses . . . .").

abetting breach of fiduciary duty claims against defendant banks and related entities); *In re Crown Vantage, Inc.*, 2003 WL 25257821, at *6.

Uecker contends that even if the *in pari delicto* defense applies to a liquidating trustee, there are factual issues regarding the application of the adverse interest and sole actor exceptions that cannot be decided on the pleadings. The "adverse interest exception" provides that where corporate agents act in a manner adverse to the interests of the corporation, the actions of the agents are not imputed to the corporation. *See In re Crown Vantage, Inc.*, 2003 WL 25257821, at *7. That exception, however, "is itself subject to an exception—the 'sole actor' exception." *R.F. Lafferty & Co.*, 267 F.3d at 359. The sole actor exception provides hat a defrauded entity cannot escape the imputation of knowledge under the *in pari delicto* doctrine when the defrauded entity and the alleged bad actors are one and the same. *See In re California TD*, 489 B.R. at 129-132.

Although the imputation analysis "generally rests on questions of fact," "[w]here, as here, a plaintiff's own pleadings contain admissions that establish the basis of an unclean hands defense, the defense may be applied without further" proceedings. *Peregrine Funding*, 133 Cal. App. 4th at 681-82 (ruling that trustee's claims "should have been stricken" at the outset because they pled a "classic case" of *in pari delicto*). In *Peregrine Funding*, one individual allegedly owned and controlled the debtor, and thus the fraudulent conduct was imputed to the debtor under *in pari delicto*. 133 Cal. App. 4th at 680; *see also In re California TD*, 489 B.R. at 131. As in *Peregrine*, here, the TAC alleges that MF08's sole owner and member was the Manager, which was in turn owned and controlled by the Ngs. TAC ¶¶ 12, 15, 19. The Manager's conduct thus imputes to MF08, and in turn, to Uecker as trustee. *See also, e.g., Baena*, 453 F.3d at 7 ("[A]ssuming fraudulent financial statements, [the managers] were, on the trustee's own version of events, the primary wrongdoers. Thus, in the ordinary course, [state] courts would not allow [the managers] to sue a secondary accomplice . . . for helping in the wrong. And, if the managers' actions are imputed to [the debtor,] neither could [the debtor] (via the trustee) recover against [the third party].").

Uecker argues that the bankruptcy court erred in its application of the sole actor exception because it failed to consider Article 3.6 of "the MF08 Operating Agreement [which] provides for

the automatic removal of its managers for willful misfeasance or nonfeasance of duty." Dkt. 16 at 27.[14] However, the TAC repeatedly alleges that the Manager was the sole owner, member, and manager of MF08 and does not allege that the Manager was actually removed. *See* TAC ¶¶ 4-5, 12, 15, 16.

Uecker also argues that the bankruptcy court improperly applied *in pari delicto* because it failed to examine the degree of fault between Wells Fargo and the Manager. She relies on *Pinter v. Dahl*, 486 U.S. 622, 632 (1988), which held that *in pari delicto* is not available unless the degrees of fault between the plaintiff and the defendant are substantially the same. Uecker asserts that the bankruptcy court never performed this analysis, and that even if it had, doing so would have involved factual determinations inappropriate in the context of a motion to dismiss. However, where the pleadings establish that the plaintiff is as at least as blameworthy as the defendant, dismissal based on *in pari delicto* is appropriate. *See Mosier v. Callister, Nebeker & McCullough, P.C.*, 546 F.3d 1271, 1276 (10th Cir. 2008); *In re Dublin Sec.*, 133 F.3d at 380 ("[The trustee] admits in his complaint that the debtor's own actions were instrumental in perpetrating the fraud on the individuals choosing to invest in [the] schemes. That pleading concedes, for example, that the debtors intentionally defrauded their investors. Such purposeful conduct thus establishes conclusively that the debtors were at least as culpable as the defendants in this matter."). Here, the TAC alleges that the Ngs, as the Manager of MF08, perpetrated a fraudulent scheme to transfer substantially all of MF08's assets to R.E. Loans, and nothing in the TAC suggests that Wells Fargo's conduct is as or more blameworthy than that of the Manager.

## IV.    Dismissal With Prejudice

Wells Fargo asks the Court to affirm the bankruptcy court's February 20, 2014 order dismissing the TAC with prejudice because the TAC represents Uecker's fourth unsuccessful attempt to plead a claim for aiding and abetting breach of fiduciary duty and amendment would therefore be futile.

---

[14] The TAC does not mention MF08's "Operating Agreement" and the parties have not attached it as an exhibit. *See generally* TAC; Dkt. Nos. 16, 17, and 18.

United States District Court
Northern District of California

1  A complaint may be dismissed with prejudice where the Court determines that the pleading

2  could not possibly be cured by the allegation of other facts.  *Bly-Magee v. California*, 236 F.3d

3  1014, 1019 (9th Cir. 2001).  A complaint may be dismissed where amendment would be futile.

4  *Steckman v. Hart Brewing, Inc.*, 143 F.3d 1293, 1298 (9th Cir. 1998).

5  The bankruptcy court properly dismissed the TAC with prejudice.  As discussed above, the

6  TAC fails to state a claim for aiding and abetting breach of fiduciary duty and the doctrine of *in*

7  *pari delicto* precludes Uecker's aiding and abetting claim.  Accordingly, the Court AFFIRMS the

8  bankruptcy court's February 11, 2014 memorandum decision and February 20, 2014 order and

9  enters final judgment in favor of Wells Fargo.

**CONCLUSION**

For the foregoing reasons, the Court DISMISSES appellant's appeal from the March 13,

2013 order of the bankruptcy court for lack of subject matter jurisdiction, and alternatively

AFFIRMS the dismissal of the fraudulent transfer claim.  The Court AFFIRMS the bankruptcy

court's February 11, 2014 memorandum decision and February 20, 2014 order.

**IT IS SO ORDERED**.

Dated: March ___23___, 2015                                    _____

SUSAN ILLSTON
United States District Judge